**Albert MOORE, Petitioner,**

v.

**John De YOUNG, Warden, Passaic County Jail, and Frank Davenport, Sheriff, Respondents.**

**Civ. A. No. 867–73.**

United States District Court, D. New Jersey. June 21, 1974.

Stanley C. Van Ness, Public Defender, John H. Ratliff, Asst. Deputy Public Defender, East Orange, N. J., for petitioner.

Joseph D. J. Gourley, Passaic County Pros. by John P. Goceljak, Asst. Pros., Paterson, N. J., for respondents.

## OPINION and ORDER

WHIPPLE, District Judge:

Petitioner, Albert Moore, seeks issuance of a writ of habeas corpus pursuant to the provisions of 28 U.S.C. § 2241 et seq., attacking the legality of his confinement in the Passaic County Jail.

Upon the filing of respondent's answer, the cause was referred to the Honorable John W. Devine, United States Magistrate, pursuant to General Rule 40,

subd. E(3), for his preliminary review and report and recommendation to this Court as to whether a hearing is warranted.

This Court has conducted an independent review, in compliance with Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963) and 28 U.S.C. § 636(b)(3), of the petition for the writ, the answer of the respondent, the exhibits, and the report and recommendation of the Federal Magistrate, which is filed with this Opinion and Order; and upon consideration of the foregoing.

It is, on this 21st day of June, 1974, Ordered that the report and recommendation of the Federal Magistrate be and is hereby adopted as the opinion of this Court and that the petition of Albert Moore for a writ of habeas corpus filed in this Court on June 19, 1973 be and is hereby granted; and it is further

Ordered that the criminal proceedings instituted in Passaic County against the petitioner, pursuant to the indictments discussed in the Federal Magistrate's report and recommendation, be and the same are hereby permanently stayed.

## REPORT AND RECOMMENDATION

■■ Albert Moore has filed a petition for habeas corpus under 28 U.S.C. A. § 2241 et seq. in which he presents two issues: has he been denied his right to a speedy trial[1] and if so, should the requested relief, dismissal of three indictments, be granted. An affirmative answer to the former question will dictate a like response to the latter. Strunk v. United States, 412 U.S. 434, 440, 93 S.Ct. 2260, 37 L.Ed.2d 56 (1973); Barker v. Wingo, 407 U.S. 514, 522, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). Petitioner is presently at large on $5,000 cash bail.[2] State remedies have been exhausted. 28 U.S.C.A. §

1. Given the facts of this case jurisdiction to consider this issue prior to trial of the pending indictments is affirmatively established by Braden v. 30th Judicial Circuit Court of Kentucky, 407 U.S. 909, 92 S.Ct. 2451, 32 L.Ed.2d 682 (1973); Kane v. State of Virginia, 419 F.2d 1369, 1373 (4 Cir. 1970).

2. The limitations of that status constitute a sufficient restriction on petitioner's liberty to satisfy the custody requirement of 28 U. S.C.A. §§ 2241(c)(3) and 2254(a). Hensley v. Municipal Court, 411 U.S. 345, 93 S.Ct. 1571, 36 L.Ed.2d 294 (1973).

2254(b); Picard v. Connor, 404 U.S. 270, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971); Fay v. Noia, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963). Cf. Williams v. Oriscello, 441 F.2d 1113 (3 Cir. 1971).

On February 6, 1967 a municipal court complaint was filed in Paterson, New Jersey, which charged petitioner with the rape of a female infant on January 11, 1967. N.J.S.A. 2A:138–1. That allegation eventuated in an indictment, 641–66,[3] charging carnal abuse, N.J.S.A. 2A:138–1, which was returned on June 8, 1968, but which was dismissed on September 25, 1970 on the ground that petitioner had been denied a speedy trial. The State did not appeal that judgment although it could have done so.[4] See the current New Jersey Rule of Court 2:3–1(b) and its antecedents there cited. Appreciation of the dismissal of Indictment 641–66 is critical to the resolution of the constitutional issue before us and requires recital of the events underlying that disposition.

From this record it is clear that petitioner left New Jersey on or about the date of the alleged crime, and that he was incarcerated in Virginia from April or May 1967 to June 30, 1970 at which time he was turned over to the New Jersey authorities. Respondents admit that petitioner's location was known to the prosecution not later than August 3, 1967 on which date a detainer was filed in Virginia premised on Indictment 641–66. Petitioner's contention that he did not learn of the indictment or of the detainer until he appeared before a parole board in December 1968 has not been denied. Thereafter, petitioner twice asked the prosecutor, by letters dated December 7, 1968 and April 16, 1969 to extradite him and filed, pro se, motions for a speedy trial, for the assignment of counsel and for other relief in the Superior Court of New Jersey and in other forums. See Moore v. Oliver, C. 1349–70, originally filed in the Eastern District of Virginia, and ultimately dismissed by this court on October 21, 1970. Indeed petitioner's efforts generated a prophetic letter from the Assignment Judge of Passaic County to its then prosecutor, dated January 30, 1969,[5] in which it was urged that efforts be made to bring him to trial. The prosecutor's staff then undertook to extradite petitioner from Virginia[6] in response to which demand the Commonwealth of Virginia advised the prosecutor's office that extradition was not necessary and that under its law petitioner's return to New Jersey could be ob-

---

3. This indictment and the outstanding three were all returned in Passaic County.

4. At oral argument to dismiss the three subsequently returned indictments which are discussed below, the assistant prosecutor contended that the State had consented "imprudently" to the *form* of the order dismissing Indictment 641–66.

5. Dear Mr. Thevos:

There is presently a Passaic County indictment for carnal abuse outstanding against one Albert Moore (State vs. Albert Moore, Ind. No. 641–66). Due to the fact that Mr. Moore has asserted his right to a speedy trial, I feel this case should be moved by your office as soon as possible.

Although Mr. Moore is presently being held on detainer in the State of Virginia, and although Virginia is not a party to the "Interstate Agreement on Detainers Act" N.J.S. 2A:159A–1 et seq., there is an available procedure by which Moore can be brought to New Jersey for trial on this indictment.

Pursuant to the "Uniform Criminal Extradition Law" N.J.S. 2A:160–33, to which Virginia is a party, Moore can be brought here for trial on the indictment and then returned to Virginia.

Please note that failure promptly to bring this defendant to trial on this charge may result in the dismissal of the indictment. State vs. Von Atzinger, 81 N.J.Super. 509, 512 (App.Div.1963).

I, therefore, suggest that you immediately take whatever steps are necessary to bring the defendant to this jurisdiction so the trial may proceed.

Yours very truly
John F. Crane, A.J.S.C.

6. That petitioner was confined in Virginia did not deny him his right to a speedy trial; neither did it relieve the State of its constitutional duty to make a diligent, good-faith effort to bring him to trial. Smith v. Hooey, 393 U.S. 374, 383, 89 S.Ct. 575, 21 L.Ed.2d 607 (1969).

tained by a much simpler process.[7] No further action however was taken by the Passaic County Prosecutor's office. The reason therefor, proferred to this court in a memorandum opposing the instant petition, was that "[a]lthough [Virginia's] procedure was not complicated, it was not followed through apparently because the assistant prosecutor who had been assigned the matter left the office and the continuity of the case was disrupted." The State has given the same reason for its inaction to its own courts.

After dismissal of Indictment 641–66, on petitioner's motion, he was released from custody. The date was September 25, 1970. No further prosecutorial action was taken against petitioner until July. 20, 1971 when three new indictments,[8] which are specifically discussed below, were returned upon the presentment by a new prosecutor.[9] Those indictments charged petitioner with atrocious assault and battery, N.J.S.A. 2A:90–1, threatening to kill, N.J.S.A. 2A:113–8, and impairing the morals of a minor, N.J.S.A. 2A:96–3. They are numbered respectively 1004, 1005 and 1006–71, and are all based upon acts said to have been committed on January 11, 1967 against the infant victim named in Indictment 641–66. Petitioner was reincarcerated on August 8, 1971.

On petitioner's motion the three 1971 indictments were dismissed by order dated October 29, 1971 on the ground that he had been denied a speedy trial as to them. The motion court's reasoning was, in essence, that inasmuch as it had already been held that petitioner had

---

7. Virginia Code "§ 53–303. Prisoners indicted or charged with crime outside State.—If a similar certificate, similarly executed, shall state that any such prisoner has been indicted or stands legally charged with crime outside this State, the Director, in his discretion, but only with the approval of the Governor, may likewise deliver the prisoner to the officer presenting the certificate, upon such conditions as to the return of the prisoner as may seem best adapted to meet the ends of justice.

"Any such officer of the United States, of the District of Columbia, or of any other state to whom custody of any such prisoner has been surrendered, is hereby clothed with all of the authority and powers of a sheriff or a guard of the State penitentiary with respect to the custody of such prisoner in the State of Virginia.

"Any duly authorized officer of the United States or the District of Columbia, or of any other state, while engaged in transporting through this State to any other state any prisoner of the United States or of the District of Columbia, or of any other state lawfully taken or surrendered into his custody either within or without this State in any manner, shall while transporting such prisoner into or through this State be clothed with all of the authority and powers of a sheriff or of a guard of the State penitentiary with respect to the custody of such prisoner in the State of Virginia. (1938, p. 757; Michie Code 1942, § 4928(7); R.P. 1948, § 53–303.)"

8. We recognize that in United States v. Ewell, 383 U.S. 116, 86 S.Ct. 773, 15 L.Ed.2d

627 (1966) indictments returned on December 14, 1962 were dismissed on January 13 and April 13, 1964 and that indictments handed up on March 26 and June 15, 1964 were dismissed on July 13 and 30, 1964 on the ground that the defendants had been denied a speedy trial. In *Ewell*, however, the initial dismissals were occasioned by a then recent decision of the Seventh Circuit in an unrelated case. In reversing the Supreme Court held that the only important intervals were those which ran from the initial dismissals, January 13 and April 13, 1964 to reindictment March 26 and June 15, 1964. *Ewell* is obviously inapposite to the case at hand.

9. In the interim the local Paterson press had begun, on May 4, 1971, to publish articles and editorials in which it said that the victim's mother and brother had not learned of the dismissal, "without a jury trial," of Indictment 641–66 until April 1971 and had then come to it in an effort to obtain justice. In addition the press reported that further prosecution of petitioner was being looked into by the Passaic County prosecutor whose purportedly quoted comments substantiated that assertion. Those articles which were submitted to the Supreme Court of New Jersey and are now before us are dated May 4, 5, 6 and 7, July 15, 21 and 31, August 5, 9, 11 and 17, September 20, 1971 and November 14 and December 1, 1972. Although arguably irrelevant to our inquiry here it should be noted that it was also then reported that the rapist was a black narcotic addict and the victim white.

been denied that right as to Indictment 641–66 he necessarily had been so deprived as to Indictments 1004, 1005 and 1006–71. Petitioner was again set at liberty. On appeal however that judgment was reversed as to Indictments 1004 and 1005–71 but affirmed as to 1006–71. State v. Moore, Docket No. A–546–71, decided November 30, 1972, unreported. The basis for the Appellate Division's ruling was that Indictment 1006–71 (impairing the morals of a minor) comprised an offense included within that set out in Indictment 641–66 but that Indictments 1004 and 1005–71 accused petitioner of crimes different from those charged in that dismissed. Petitioner's application to the Supreme Court of New Jersey for further review was denied on January 18, 1973. On January 2, 1973 petitioner, unable to post bail, had been jailed again.

Petitioner subsequently moved successfully for an evidentiary hearing to determine whether he had suffered prejudice because of pre-indictment delay as to Indictments 1004 and 1005–71. That hearing was held on March 5 and 22, 1973. On the latter date the court found that petitioner had failed to show actual resultant prejudice.[10] Applications for leave to appeal to the Appellate Division and to the Supreme Court of New Jersey, which were denied, exhausted State remedies as to this issue.

On June 1, 1973 bail of $5,000 was posted on behalf of the petitioner who thereafter applied to this court for habeas corpus relief and for an order, which was granted, staying the State trial until resolution of this petition. See 28 U.S.C.A. § 2251.

Petitioner now contends, citing Barker v. Wingo, supra, and Dickey v. Florida, 398 U.S. 30, 90 S.Ct. 1564, 26 L.Ed. 2d 26 (1970), that he has been denied his right to a speedy trial on Indictments 1004 and 1005–71 and is therefore entitled to relief by way of their dismissal under the Sixth and Fourteenth Amendments.

In *Barker* the Supreme Court set the background for consideration of the issues we face in the following language.

*"The right to a speedy trial is generically different from any of the other rights enshrined in the Constitution for the protection of the accused. In addition* to the general concern that all accused persons be treated according to decent and fair procedures, *there is a societal interest in providing a speedy trial which exists separate from, and at times in opposition to, the interests of the accused . . ."*

"If an accused cannot make bail, he is generally confined, as was Barker for 10 months, in a local jail. This contributes to the overcrowding and generally deplorable state of those institutions. Lengthy exposure to these conditions 'has a destructive effect on human character and makes the rehabilitation of the individual offender much more difficult.' At times the result may even be violent rioting. Finally, lengthy pretrial detention is costly. The cost of maintaining a prisoner in jail varies from $3 to $9 per day, and this amounts to millions across the Nation. In addition, society loses wages which might have been earned, and it must often support families of incarcerated breadwinners.

"A second difference between the right to a speedy trial and the accused's other constitutional rights is that deprivation of the right may work to the accused's advantage. Delay is not an uncommon defense tactic. As the time between the commission

---

10. It is undisputed that the passage of time had made impossible meaningful analysis of stains or discolorations found on a mattress said to have been the situs of the crime and subsequently lost, and on petitioner's clothes. Under 28 U.S.C.A. § 2254(d) and absent factors not present here this court is required to accept as correct the factual findings made by the State court at the evidentiary hearing. The same mandate does not obtain as to a State court's conclusion of law. Townsend v. Sain, 372 U.S. 293, 83 S. Ct. 745, 9 L.Ed.2d 770 (1963).

of the crime and trial lengthens, witnesses may become unavailable or their memories may fade. If the witnesses support the prosecution, its case will be weakened, sometimes seriously so. And it is the prosecution which carries the burden of proof. Thus, unlike the right to counsel or the right to be free from compelled self-incrimination, deprivation of the right to speedy trial does not per se prejudice the accused's ability to defend himself.

"Finally, and perhaps most importantly, the right to speedy trial is a more vague concept than other procedural rights. It is, for example, impossible to determine with precision when the right has been denied. We cannot definitely say how long is too long in a system where justice is supposed to be swift but deliberate. As a consequence, there is no fixed point in the criminal process when the State can put the defendant to the choice of either exercising or waiving the right to a speedy trial. If, for example, the State moves for a 60-day continuance, granting that continuance is not a violation of the right to speedy trial unless the circumstances of the case are such that further delay would endanger the values the right protects. It is impossible to do more than generalize about when those circumstances exist. There is nothing comparable to the point in the process when a defendant exercises or waives his right to counsel or his right to a jury trial. Thus, as we recognized in Beavers v. Haubert, [198 U.S. 77, [25 S.Ct. 573, 49 L.Ed. 950] (1905)], any inquiry into a speedy trial claim necessitates a functional analysis of the right in the particular context of the case:

'The right of a speedy trial is necessarily relative. It is consistent with delays and depends upon circumstances. It secures rights to a defendant. It does not preclude the rights of public justice.' 198 U.S., at 87, [25 S.Ct. 573.]

*"The amorphous quality of the right also leads to the unsatisfactorily severe remedy of dismissal of the indictment when the right has been deprived. This is indeed a serious consequence because it means that a defendant who may be guilty of a serious crime will go free, without having been tried. Such a remedy is more serious than an exclusionary rule or a reversal for a new trial, but it is the only possible remedy."* (Emphasis added.) (Footnotes omitted.) 407 U.S. at 519 ff, 92 S.Ct. at 2186, 33 L. Ed.2d 101.

In light of the presence of the aforementioned competing considerations the Court directed that the relevant circumstances be the subject of a

". . . balancing test [which] necessarily compels courts to approach speedy trial cases on an *ad hoc* basis. We can do little more than identify some of the factors which courts should assess in determining whether a particular defendant has been deprived of his right. Though some might express them in different ways, we identify four such factors: Length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant.[30] (Em-

"30. See e. g., United States v. Simmons, 338 F.2d 804, 807 (CA 2 1964), cert. denied, 380 U.S. 983, [85 S.Ct. 1352, 14 L.Ed.2d 276] (1965); Note, The Right to a Speedy Trial, 20 Stan.L.Rev. 476, 478 n. 15 (1968).

phasis in original)

"In his concurring opinion in *Dickey*, Mr. Justice Brennan identified three factors for consideration: the source of the delay, the reasons for it, and whether the delay prejudiced the interests protected by the right. 398 U.S., at 48, [90 S.Ct. 1564.] He included consideration of the defendant's failure to assert his right in the cause-of-delay category, and he thought the length of delay was relevant primarily to the reasons for delay and its prejudicial effects. Id.,

n. 12. In essence, however, there is little difference between his approach and the one we adopt today. See also Note, The Right to a Speedy Trial, supra, for another slightly different approach."

The Court went on to say:

"The length of the delay is to some extent a triggering mechanism. Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance. Nevertheless, because of the imprecision of the right to speedy trial, the length of delay that will provoke such an inquiry is necessarily dependent upon the peculiar circumstances of the case.[31] To

31. For example, the First Circuit thought a delay of nine months overly long, absent a good reason, in a case that depended on eyewitness testimony. United States v. Butler, 426 F.2d 1275, 1277 (1970).

take but one example, *the delay that can be tolerated for an ordinary street crime is considerably less than for a serious, complex conspiracy charge.*

"Closely related to length of delay is the reason the government assigns to justify the delay. Here, too, different weights should be assigned to different reasons. A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government.[32] *A more*

32. We have indicated on previous occasions that it is improper for the prosecution intentionally to delay 'to gain some tactical advantage over [defendants] or to harass them.' United States v. Marion, 404 U.S. 307, 325, [92 S.Ct. 455, 30 L.Ed.2d 468] (1971). See Pollard v. United States, 352 U.S. 354, 361, [77 S.Ct. 481, 1 L.Ed.2d 393] (1957).

*neutral reason such as negligence* or overcrowded courts *should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant.* Finally, a valid reason, such as a missing wit-

ness, should serve to justify appropriate delay.

"We have already discussed the third factor, the defendant's responsibility to assert his right. Whether and how a defendant asserts his right is closely related to the other factors we have mentioned. The strength of his efforts will be affected by the length of the delay, to some extent by the reason for the delay, and most particularly by the personal prejudice, which is not always readily identifiable, that he experiences. The more serious the deprivation, the more likely a defendant is to complain. *The defendant's assertion of his speedy trial right, then, is entitled to strong evidentiary weight in determining whether the defendant is being deprived of the right.* We emphasize that failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial.

"*A fourth factor is prejudice to the defendant.* Prejudice, of course, should be assessed in the light of the interests of defendants which the speedy trial right was designed to protect. *This Court has identified three such interests:*

*(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired.*[33] Of these,

33. United States v. Ewell, 383 U.S. 116, at 120, [86 S.Ct. 773, 15 L.Ed.2d 627]; Smith v. Hooey, 393 U.S. 374, 377–378, [89 S.Ct. 575, 21 L.Ed.2d 607] (1969). In Klopfer v. North Carolina, 386 U.S. 213, 221–222, [87 S.Ct. 988, 18 L.Ed.2d 1] (1967), we indicated that a defendant awaiting trial on bond might be subjected to public scorn, deprived of employment, and chilled in the exercise of his right to speak for, associate with, and participate in unpopular political causes.

*the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system.* If witnesses die or disappear during a delay,

the prejudice is obvious. There is also prejudice if defense witnesses are unable to recall accurately events of the distant past. Loss of memory, however, is not always reflected in the record because what has been forgotten can rarely be shown. We have discussed previously the societal disadvantages of lengthy pretrial incarceration, but obviously the disadvantages for the accused who cannot obtain his release are even more serious. The time spent in jail awaiting trial has a detrimental impact on the individual. It often means loss of a job; it disrupts family life; and it enforces idleness. Most jails offer little or no recreational or rehabilitative programs.[34] The time spent in jail is

34. See To Establish Justice, To Insure Domestic Tranquility, Final Report of the National Commission on the Causes and Prevention of Violence 152 (1969).

simply dead time. Moreover, if a defendant is locked up, he is hindered in his ability to gather evidence, contact witnesses, or otherwise prepare his defense.[35] Imposing those conse-

35. There is statistical evidence that persons who are detained between arrest and trial are more likely to receive prison sentences than those who obtain pretrial release, although other factors bear upon this correlation. See Wald, Pretrial Detention and Ultimate Freedom: A Statistical Study, 39 N.Y.U.L. Rev. 631 (1964).

quences on anyone who has not yet been convicted is serious. It is especially unfortunate to impose them on those persons who are ultimately found to be innocent. Finally, even if an accused is not incarcerated prior to trial, he is still disadvantaged by restraints on his liberty and by living under a cloud of anxiety, suspicion, and often hostility. See cases cited in n. 33, *supra.*

"We regard none of the four factors identified above as either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial. Rather, they are related factors and must be considered together with such other circumstances as may be relevant. In sum, these factors have no talismanic qualities; courts must still engage in a difficult and sensitive balancing process.[36] But, because we

36. For an example of how the speedy trial issue should be approached, see Judge Frankel's excellent opinion in United States v. Mann, 291 F.Supp. 268 (S.D.N.Y.1968)."

are dealing with a fundamental right of the accused, this process must be carried out with full recognition that the accused's interest in a speedy trial is specifically affirmed in the Constitution." (Emphasis added). 407 U.S. at 530–533, 92 S.Ct. at 2192.

Thus, to balance the competing considerations involved in the case before us we must first determine the length of and the reason for the delay which in turn obviously requires recognition of its starting point. We look again to *Barker,* at 527, 92 S.Ct. at 2190, where the Court said,

"The nature of the speedy trial right does make it impossible to pinpoint a precise time in the process when the right must be asserted or waived, but that fact does not argue for placing the burden of protecting the right solely on defendants. A defendant has no duty to bring himself to trial;[26] the State has that duty as

26. As Mr. Chief Justice Burger wrote for the Court in Dickey v. Florida:
"'Although a great many accused persons seek to put off the confrontation as long as possible, the right to a prompt inquiry into criminal charges is fundamental and the duty of the charging authority is to provide a prompt trial.'" 398 U.S. 30, 37–38, [90 S.Ct. 1564, 26 L.Ed.2d 26] (1970) (footnote omitted).

well as the duty of insuring that the trial is consistent with due process.[27]

27. As a circuit judge, Mr. Justice Blackmun wrote:
"The government and, for that matter, the trial court are not without responsibility for the expeditious trial of criminal cases. The burden for trial promptness is not solely upon the defense. The right to 'a speedy . . . trial' is constitutionally guaranteed and, as such,

is not to be honored only for the vigilant and the knowledgeable." Hodges v. United States, 408 F.2d 543, 551 (CA 8 1969)."

Moreover, for the reasons earlier expressed, society has a particular interest in bringing swift prosecutions, and society's representatives are the ones who should protect that interest.

In this case the complaint was filed on February 6, 1967, the first indictment, 641–66, was returned on June 8, 1967 and the detainer was lodged on August 3, 1967. Recognizing that the violation alleged in Indictment 641–66 was carnal abuse, as opposed to atrocious assault and battery and threatening to kill as charged in those pending, it follows that the prosecution of this petitioner for his alleged actions on January 11, 1967 began not later than June 8, 1967 when the first indictment was returned and he hereby became the accused. United States v. Marion, 404 U.S. 307, 313 and 320, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971); Hanrahan v. United States, 121 U.S.App.D.C. 134, 348 F.2d 363, 366 and 368 (1965). In no event however may that process be held not to have started until July 20, 1971 when the indictments now outstanding, 1004 and 1005–71, were obtained. By that measure the length of the delay of trial to petitioner was not less than four years, one month and 12 days. Cf. United States ex rel. Stukes v. Shovlin, 464 F.2d 1211, 1214 (3 Cir. 1972) in which it was held that a delay of 14 months did not, considering all the circumstances, deny petitioner a speedy trial. Even accepting the date on which the detainer was filed, August 3, 1967, as the starting point, in view of petitioner's absence from New Jersey, the elapsed time was three years, 11 months and 17 days which delay can only be attributed to the prosecution.[11] Moreover, the prosecution knew on June 8, 1967, and in all probability before

that date, what the victim claimed her assailant had done and the charges to which her report gave rise. With that information at hand the prosecution was free to seek the return of such indictments as it thought appropriate. That indictment 641–66 charged petitioner only with carnal abuse was the prosecution's choice. It, after all, made the presentment to the grand jury, not the petitioner. That that indictment was not moved for trial despite not only petitioner's requests to the prosecutor and to the courts, but a written suggestion to do so from the Passaic County Assignment Judge was concededly the result of the prosecution's management of this case and was in no way a product of dilatory or other maneuvers chargeable to petitioner[12] who was indeed endeavoring to do, pro se, that which the prosecution should have and could have accomplished with a modimum of relatively routine attention to an uncomplicated procedure.

It would be myopic in this case not to recognize that although the indictments now outstanding, 1004 and 1005–71, charge crimes different from that alleged in Indictment 641–66, all three arose from the same episode. And while there is no question but that the outstanding indictments were returned within the applicable statute of limitations, N.J.S.A. 2A:159–2 there can be little question but that, had they been handed up with Indictment 641–66 they would have been dismissed when it was and for the same reason. The obvious inference is that the outstanding indictments constitute an effort by the prosecution to do by indirection that which it could not do directly once Indictment 641–66 had been dismissed and the time for appeal of that judgment had, by its own, the prosecution's, inaction expired. The circumvention is apparent. It should be noted here that the respond-

11. See United States v. Dunn, 148 U.S.App. D.C. 91, 459 F.2d 1115, 1117 (1972) in which it was held that a delay of 18½ months in and of itself, denied defendant's right to a speedy trial.

12. Cf. Finton v. Lane, 356 F.2d 850, 853 (7 Cir. 1966).

ents do not allege that the outstanding indictments were not returned sooner because of the complex nature of the case or the then recent receipt of evidence, of whatever kind, not previously available although sought. Cf. United States v. Dukow, 453 F.2d 1328 (3 Cir. 1972), cert. den. 406 U.S. 945, 92 S.Ct. 2042, 32 L.Ed.2d 331 (1972) in which the delay, either 22 or 55 months, was pre-indictment and on that basis presented a Fifth but not a Sixth Amendment issue. *Dukow*, we note, involved violations of the federal securities laws. See also Hanrahan v. United States, supra. In this regard it is appropriate to note the newspaper articles and editorials mentioned in footnote nine which both demonstrate a lack of appreciation of a defendant's constitutional right to a speedy trial, said in *Barker* to be "generically different from any of the other rights enshrined in the Constitution for the protection of the accused . . ." and at the same time, and not surprisingly, repeatedly publicized the understandable outrage of the victim and her family. And while the exercise by the press of its own First Amendment entitlement is not to be denigrated neither is it a license to deprive another through catalystic action of a similarly grounded right particularly one "generically different" from all others. We do well here to recall the language of *Barker*, quoted earlier, that the four listed factors are to "be considered together with such other circumstances as may be relevant." Id. 407 U.S. at 533, 92 S.Ct. at 2193, 33 L.Ed.2d 101.

Given (a) the prosecution's unacquitted duty, which it bore not later than August 3, 1967 to proceed to provide a speedy trial for the sake of society and the petitioner, (b) that the outstanding indictments are premised upon the very episode which was the substance of Indictment 641–66, the dismissal of which was not appealed and despite (c) that the petitioner has made every effort to avoid trial on Indictments 1004 and 1005–71, we find the delay here inexcus-

able. The reason is that petitioner's demands to be tried on Indictment 641–66 acquitted him of any duty he may have had to have had himself brought to trial. Were it otherwise the impact of the dismissal of an indictment because a defendant had been denied a speedy trial thereon, could frequently be avoided by the obtaining of a new indictment, albeit on different and other than lesser included charges, arising from the same incident. Such a result would prefer form to substance, an exaltation not to be desired or permitted. The question of prejudice remains.

As mentioned earlier the State courts have found that petitioner has suffered no resultant prejudice because Indictments 1004 and 1005–71 were not returned until July 1971. Putting aside the loss of evidence noted in footnote ten and accepting that finding as to its factual aspect, it does not follow that petitioner has suffered no prejudice or that he has not been denied his right to a speedy trial. Indeed the return of an indictment alone puts the one it charges in an undesirable limelight of obloquy. As the Court wrote in United States v. Marion, supra, 404 U.S. at 320, 92 S.Ct. at 463, quoted approvingly in the concurring opinion of Justice White in *Barker*, supra, 407 U.S. at 537.

"Inordinate delay between arrest, indictment, and trial may impair a defendant's ability to present an effective defense. *But the major evils protected against by the speedy trial guarantee exist quite apart from actual or possible prejudice to an accused's defense.* To legally arrest and detain, the Government must assert probable cause to believe the arrestee has committed a crime. *Arrest* is a public act that may seriously interfere with the defendant's liberty, whether he is free on bail or not, and that *may disrupt his employment, drain his financial resources,* curtail his associations, subject him to public obloquy, *and create anxiety in him,* his family and his friends. These considerations were substantial underpinnings for

the decision in Klopfer v. North Carolina, supra; see also Smith v. Hooey, 393 U.S. 374, 377–378, 89 S.Ct. 575, 576–577, 21 L.Ed.2d 607 (1969). So viewed, it is readily understandable that it is either a formal indictment[13] or information or else the actual restraints imposed by arrest and holding to answer a criminal charge that engage the particular protections of the speedy trial provision of the Sixth Amendment."

(Emphasis added). See also Moore v. Arizona, 414 U.S. 25, 27, 94 S.Ct. 188, 38 L.Ed.2d 183 (1973) where the Court in a per curiam decision approvingly quoted the essence of the foregoing excerpt.

The applicability of the *Marion* Court's rationale to this petition is clear and is amply demonstrated by petitioner's confinement in New Jersey for a total of 319 days spread over a period of two years and 11 months. The impact of that incarceration is not at all diminished and indeed may well have been exacerbated by virtue of its division into periods of 87, 82 and 150 days.[14] Thus upon the dismissal of Indictment 641–66 petitioner was initially employed, in October 1970, by a roofing company. That employment was first interrupted on August 8, 1971 when he was taken into custody upon return of Indictments 1004, 1005 and 1006–71. It was resumed on November 29, 1971 after their dismissal and his release on October 29, 1971 and continued until January 2, 1973 when petitioner was again incarcerated. When petitioner finally posted bail, June 1, 1973, he again returned to his roofing job at which he is still employed. Petitioner's gross weekly wages fluctuate between $100.00 and $130.00 This information, with which the respondents' attorney has affirmatively stated to the court by telephone that he takes no issue, has been proffered through the affidavit of petitioner's counsel.

▇ We recognize that absent special circumstances pre-indictment as opposed to post-indictment delay in prosecution, within the time permitted by the applicable statute of limitations and consequently in trial, is not ordinarily a cause for granting the relief sought here. United States v. Marion, supra, 404 U.S. 313ff, 92 S.Ct. 455, 30 L.Ed.2d 468. But this case is not run-of-the-mine in that context; rather is it critically distinguishable by reason of the dismissal of Indictment 641–66 and the identity of its underlying episode with that of Indictments 1004 and 1005–71. From that viewpoint the delay here was in effect post-indictment or and perhaps more precisely, post-prosecution initiation. United States v. Marion, supra at 320–321, 92 S.Ct. 455[15] and Dickey v. Flori-

---

13. In terms of resolving the instant Sixth Amendment issue it is our view that the relevant "formal indictment" is 641–66 and not 1004 and 1005–71.

14. Petitioner was confined upon his release from Virginia, June 30, 1970 to September 25, 1970 when Indictment 641–66 was dismissed, from August 8, 1971 when he was arrested on the pending indictments until October 29, 1971 when they were dismissed by the trial court and from January 2, 1973 when he was confined following the Appellate Division's reinstatement of Indictments 1004 and 1005–71 until June 1, 1973 when his bail was posted. That these periods of incarceration (except perhaps for the first), were the product of petitioner's own efforts to enforce his Sixth Amendment rights and therefore are not chargeable to the State is an argument without substance. Such a Hobson's choice has no place in our jurisprudence.

15. Footnote 12 to *Marion*, supra at 321, 92 S.Ct. at 463, reads as follows:
"In its Standards Relating to Speedy Trial, n. 10 supra, at 6, the ABA defined the time at which the beginning of the delay period should be computed as
'the date the charge is filed, except that if the defendant has been continuously held in custody or on bail or recognizance until that date to answer for the same crime or a crime based on the same conduct or arising from the same criminal episode, then the time for trial should commence running from the date he was held to answer.' Rule 2.2(a).
Under the ABA Standards, after a defendant is charged, it is contemplated that his right to a speedy trial would be mea-

da, supra. In the latter case a detainer and warrant were issued on September 1, 1960, an information was filed on December 15, 1967 and trial was originally scheduled for January 31, 1968. At page 37 the Court found that the crucial period began to run on September 2, 1960 when *Dickey* became the accused and not on December 15, 1967 when the information was filed. Cf. United States v. Dukow, supra.

In Moore v. Arizona, supra, it was

"[a]lmost three years after [petitioner] was charged and 28 months after he first demanded that Arizona either extradite him from California, where he was serving a prison term, or drop a detainer against him, [that he] was tried for murder . . ."

In reversing and remanding the Court wrote as follows:

"In affirming the denial of the petition, [seeking dismissal of the charge on Sixth and Fourteenth Amendment grounds] the Arizona Supreme Court ruled that under this Court's decisions in Dickey v. Florida, 398 U.S. 30, 90 S.Ct. 1564, 26 L.Ed.2d 26 (1970), and Barker v. Wingo, 407 U.S. 514, 92 S. Ct. 2182, 33 L.Ed.2d 101 (1972), a showing of prejudice to the defense at trial was essential to establish a federal speedy trial claim.

.    .    .    .    .    .

"The state court was in fundamental error in its reading of Barker v. Wingo, and in the standard applied in judging petitioner's speedy trial claim. Barker v. Wingo expressly rejected the notion that an affirmative demonstration of prejudice was necessary to prove a denial of the constitutional right to a speedy trial . . ."[16]

The New Jersey courts applied the same standard to this petitioner's claim of prejudice as did those of Arizona.

With the *Moore* explication of *Barker* before us we look again to the latter for guidance in determining whether the instant petitioner has suffered prejudice for which determination *Barker* identifies three relevant considerations:

(1) prevention of oppressive pretrial incarceration; (2) minimization of anxiety and concern to the accused; and (3) limitation of the possibility that the defense will be impaired. Of these the last is the most serious "because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Barker* at 532, 92 S.Ct. at 2193.

The instant petitioner was confined in New Jersey for 319 days between June 30, 1970 and June 1, 1973 a period of two years and 11 months. On this record petitioner's anxiety and concern, or at the very least and for whatever reason his demand for a speedy trial, were first communicated to the prosecutor in a letter dated December 7, 1968. Petitioner wrote at least one other letter of like purpose dated April 16, 1969 and also filed pro se applications to the Passaic County Court seeking the same relief. Finally we note the loss of real evidence as described in footnote 10, supra. Beyond that circumstance, unfavorable to State and petitioner alike from the standpoint of justice, are the general concerns iterated in *Barker* at 532, 92 S.Ct. 2182 and in *Marion*, 404 U.S. at 320, 92 S.Ct. 455.

■ In summary this record demonstrates that trial was delayed for virtually four years, that that delay, August 8, 1967 to July 20, 1971,[17] was at-

sured by a statutory time period excluding necessary and other justifiable delays; there is no necessity to allege or show prejudice to the defense. Rule 2.1, ibid."

16. On remand the Supreme Court of Arizona dismissed the charge in an unreported decision. See this court's Exhibit Two.

17. August 8, 1967 and July 20, 1971 are, respectively, the dates on which the detainer was filed and the outstanding indictments were returned.

tributable solely to the prosecution's administrative dereliction and not at all to the petitioner who asserted his right to a speedy trial more than once and who was prejudiced by its denial under the considerations of *Barker, supra* and *Marion, supra.*

Assaying this petition in light of *Moore, Barker, Marion* and *Dickey* it is our view that the scale is weighted in petitioner's favor and so find that he has been denied the speedy trial guaranteed by the Sixth Amendment. Having reached that conclusion it follows that we must recommend that this petition be granted. We reach this conclusion fully cognizant of the expressed realization of Mr. Justice Powell in *Barker,* 407 U.S. at 522, 92 S.Ct. 2182, see also *Strunk,* supra, 412 U.S. at 439–440, 93 S.Ct. 2260, 37 L.Ed.2d 56, that the only remedy for denial of a speedy trial is dismis-

sal of the pending indictments. In this case, which involves "an [all too] ordinary street crime," *Barker,* 407 U.S. at 531, 92 S.Ct. at 2192, responsibility for that result falls squarely on the State's representatives who, despite repeated demands from petitioner and strong direction from their own Assignment Judge, failed to do their constitutional duty,[18] and in so failing irreversibly generated the result mandated by the Supreme Court of the United States.

Because of the record before us no evidentiary hearing is required.[19] Townsend v. Sain, supra. Respondents need *no certificate of probable cause.* United States ex rel. Green v. Rundle, 452 F.2d 232 (3 Cir. 1971).

Respectfully submitted,

John W. Devine

United States Magistrate

Dated: June 7, 1974

---

[18] *Barker,* supra at 527 and 529, 92 S.Ct. 2182; Dickey v. Florida, supra, 398 U.S. at 37–38, 90 S.Ct. 1564; Smith v. Hooey, supra, 393 U.S. at 377 and 383, 89 S.Ct. 575, 21 L.Ed.2d 607; Hodges v. United States, 408 F.2d 543, 551 (8 Cir. 1969); Hanrahan v. United States, supra, 348 F.2d at 366 and fn. 6 thereon.

[19] The following exhibits have been received:
- P–1: Petitioner's memorandum in support of the instant application.
- R–1: Motion transcript, State v. Moore, Inds. 1004, 1005 and 1006–71 dated October 1, 1971.
- R–2: State's brief on direct appeal from judgment entered on R–1.
- R–3: Appendix to R–2.
- R–4: Petitioner's brief in reply to R–2.
- R–5: Appellate Division decision, State v. Moore, A–546–71 dated November 30, 1972 unpublished.
- R–6: Petitioner's notice of motion for leave to appeal R–5 to the Supreme Court of New Jersey.
- R–7: State's letter reply to R–6.
- R–8: Supreme Court of New Jersey Order denying R–6.
- R–9: Petitioner's brief on motion for evidentiary hearing on speedy trial issue.
- R–10: State v. Moore, Inds. 1004 and 1005–71, Transcripts of argument on motion for evidentiary hearing held February 2, 1973.
- R–11: State's letter response to R–9 dated February 13, 1973.
- R–12: Transcript of evidentiary hearing, State v. Moore, Inds. 1004 and 1005–71 in two volumes dated March 5 and 22, 1973.
- R–13: Order dated April 22, 1973 denying petitioner's application to dismiss Indictments 1004 and 1005–71 for failure to have received speedy trial.
- R–14: Petitioner's notice of motion for leave to appeal R–13 to Appellate Division.
- R–15: State's response to R–14.
- R–16: Appellate Division's order denying R–14.
- R–17: Petitioner's notice of motion for leave to appeal R–16 to Supreme Court of New Jersey.
- R–18: State's letter reply to R–17 dated May 23, 1973.
- R–19: Supreme Court of New Jersey Order denying R–17.
- R–20: Respondents' memorandum in opposition to instant petition.
- Court Exhibit 1: Affidavit of John Ratliff dated June 3, 1974.
- Court Exhibit 2: Order of Supreme Court of Arizona re: Moore v. State of Arizona, supra.